PACIFIC TRIAL ATTORNEYS
A Professional Corporation
Scott J. Ferrell, Bar No. 202091
sferrell@pacifictrialattorneys.com
Victoria C. Knowles, Bar No. 277231
vknowles@pacifictrialattorneys.com
4100 Newport Place Drive, Ste. 800
Newport Beach, CA 92660
Tel: (949) 706-6464
Fax: (949) 706-6469

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| REBEKA RODRIGUEZ,<br>Plaintiff,<br>v.<br>SIX FLAGS ENTERTAINMENT CORPORATION, a Delaware corporation, d/b/a WWW.KNOTTS.COM,<br>Defendant. | Case No.: 2:25-cv-06661-DMG-AGR<br>**FIRST AMENDED COMPLAINT** |

Plaintiff Rebeka Rodriguez ("Plaintiff") alleges as follows:

## I. NATURE OF ACTION

1. This First Amended Complaint concerns an egregious privacy violation and total breach of consumer trust in violation of California law. When consumers visit the commercial website of https://www.knotts.com/ (the "Website"), which is owned and operated by Defendant Six Flags Entertainment Corporation ("Defendant"), Defendant displays to them a pop-up cookie consent banner known as a consent management platform ("CMP") on the homepage. Defendant's cookie banner discloses that the Website uses cookies, but expressly gives users the option to control how they are tracked and how their personal data is used. Defendant assures visitors that they can

choose to "Deny Non-Essential" cookies by clicking a button with that name as shown in the following screenshot:




2. Like many internet websites, Defendant designed the Website to include resources and programming scripts from third parties that enable those parties to place cookies and other similar tracking technologies on visitors' browsers and devices and/or transmit cookies along with user data. Unlike other websites, however, Defendant's Website offers consumers a choice to browse without being tracked, followed, and targeted by third party data brokers and advertisers. Defendant's promises, however, are false. Defendant's promises are designed to lull users into a false sense of security. Even after users elect to "Deny Non-Essential" cookies, Defendant surreptitiously enables several third parties – including Claritas, Pinterest, IPONWEB / Criteo, and Basis / Centro / SiteScout (the "Third Parties") – to track users' website browsing activities and eavesdrop on users' private communications on the Website via either pixels or third-party cookies stored on user devices from which they transmit information to third party servers.

3. Contrary to users' express rejection of cookies and tracking technologies on the Website, Defendant, nonetheless, caused cookies, including the Third Parties'

cookies, to be sent to Plaintiff and other visitors' browsers, stored on their devices, and transmitted to the Third Parties along with user data. Plaintiff is informed and believes and thereon alleges that these third-party cookies permitted the Third Parties to track and collect data in real time regarding Website visitors' behaviors and communications including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

4. The Third Parties analyze and aggregate this user data across websites and time for their own purposes and financial gain including creating consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; creating audience segments based on shared traits (such as Millennials, tech enthusiasts, etc.); and performing targeted advertising and marketing analytics. Further, the Third Parties share user data and/or user profiles to unknown parties to further their financial gain.

5. This type of tracking and data sharing is exactly what the Website visitors who clicked or selected the "Deny Non-Essential" button on the Website's cookie consent banner sought to avoid. Defendant falsely told Website users that it respected their privacy and that they could avoid tracking and data sharing when they browsed the Website. Despite receiving notice of consumers' express declination of consent, Defendant defied it and violated state statutes, and tort duties.

## II. THE PARTIES

6. Plaintiff is, and was at all relevant times, an individual and resident of the State of California. Plaintiff is and was at all times mentioned herein a citizen of the State of California. Plaintiff intends to remain in California and makes her permanent home there.

7. Defendant is a corporation incorporated under the laws of the State of Delaware. According to Defendant's Notice of Motion and Motion to Dismiss

Plaintiff's Complaint filed in Case No. 2:25-cv-06824-CBM-PD, it has represented that its principal place of business is the state of North Carolina. (Doc. 11 in Case No. 2:25-cv-06824-CBM-PD at 4:16; Page ID #60.)

## III. JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 because it has original federal question jurisdiction.

9. Defendant is subject to jurisdiction under California's "long-arm" statute because the exercise of jurisdiction over Defendant is not "inconsistent with the Constitution of this state or the United States."

10. Defendant is an online retailer that owns and/or operates the Website, which markets, advertises, and sells products including amusement park tickets or season passes and merchandise nationwide and in California. Defendant has substantial contacts with and receives substantial benefits and income from and through the state of California. Defendant made, and continues to make, offers to consumers in California.

11. Defendant engaged in intentional acts by operating its Website and making it available to California residents, advertising its products including tickets and season passes via its Website to California residents including Plaintiff, expressly aiming its conduct toward California residents by conducting substantial business with residents of the State of California via its Website, and causing both intangible injuries and economic harm to California residents that Defendant knew would be likely to be suffered in California.

12. The Website has a pull down menu named "Choose Another Park" on all of its various webpages, which contains hyperlinks to more than 40 other commercial websites advertising other amusement parks owned and/or operated by Defendant both nationwide and internationally. Such other commercial websites include seven websites advertising seven amusement parks located in the State of California including: (1) Six Flags Magic Mountain located in the vicinity of Los Angeles, California; (2) Hurricane Harbor located in the vicinity of Los Angeles, California; (3) Six Flags Discovery

Kingdom located in the vicinity of San Francisco/Sacramento, California; (4) Hurricane Harbor Concord located in the vicinity of San Francisco/Sacramento, California; (5) California's Great America located in the vicinity of Santa Clara/San Jose, California; (6) Knott's Berry Farm located in Buena Park, California; and (7) Knott's Soak City located in Buena Park, California. Each of the foregoing commercial websites advertising the amusement parks located in the state of California sell online tickets and season passes and/or merchandise to consumers via such websites. Thus, the Website facilitates online transactions to occur amongst consumers interested in seven California amusement parks owned and/or operated by Defendant.

13. For example, by clicking the hyperlink named "Knott's Berry Farm" in the pull down menu named "Choose Another Park," the user is redirected to the commercial website at the domain name: https://www.knotts.com/, which is a website that advertises the Knott's Berry Farm amusement park located in Buena Park, California. Not only does such Knott's Berry Farm website offer consumers with the opportunity to purchase online tickets and passes to the Knott's Berry Farm amusement park, it also offers consumers with the opportunity to purchase merchandise via such website. For example, the Knotts's Berry Farm website has a hyperlink named "Online Merchandise" on its homepage, which, upon being clicked, takes the user to the landing page at: https://merch.cedarfair.com/collections/knotts-berry-market at which consumers can purchase merchandise online including Knott's Berry Farm-branded food products such as jams, jellies, preserves, and salad dressing.

14. The Website advertises and offers season passes to 40+ Six Flags amusement parks as prominently advertised on the homepage of the Website. Such season passes to 40+ Six Flags amusement parks are available for purchase online via the Website. Such season passes include the aforementioned seven amusement parks located in the state of California that Defendant owns and/or operates.

15. The Website's Privacy Policy expressly refers to California residents as follows:

> "**For California Residents**
>
> For a copy of our privacy notice to residents of California, in accordance with the California Consumer Privacy Act of 2018 ("CCPA"), please go to knotts.com/ccpa."

https://www.knotts.com/legal/privacy-policy (last visited Sept. 17, 2025).

16. The aforementioned Privacy Policy's reference to California residents is included because Defendant is aware that a substantial volume of California consumers visit the Website as an initial starting point, and wind up being re-directed to and ultimately visit the seven commercial websites that advertise and sell amusement park tickets/passes and other services and products relating to Defendant's amusement parks located in the state of California.

17. Defendant sells thousands of amusement park tickets and passes and products to California residents each year. Defendant sells amusement park tickets and passes and products to California residents via its various websites as part of its regular course of business. Plaintiff is informed and believes and thereon alleges that Defendant sells amusement park tickets and passes and products to California residents via its various websites after being redirected from the Website. Plaintiff is informed and believes and thereon alleges that Defendant exercises at least some level of control over the ultimate distribution of its products sold via its various websites promoting its amusement parks located in California after being redirected from the Website to the end consumer including products shipped into California.

18. Pursuant to 28 U.S.C. § 1391, venue is proper because a substantial part of the acts and events giving rise to the claims occurred in this District.

## IV. FACTUAL ALLEGATIONS

### A. Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie Trackers.

19. Every website including the Website is hosted by a server that sends and receives communications in the form of HTTP requests such as "GET" or "POST"

requests to and from Internet users' browsers. For example, when a user clicks on a hyperlink on a Website, the user's browser sends a "GET" request to the Website's server. The GET request tells the Website's server what information is being requested (e.g., the URL of the webpage being requested) and instructs the Website's server to send the information back to the user (e.g., the content of the webpage being requested). When the Website server receives an HTTP request, it processes that request and sends back an HTTP response. The HTTP request includes the client's IP address so that the Website server knows where to send the HTTP response.

20. An IP address (Internet Protocol address) is a unique numerical label assigned to each device connected to a network that uses the Internet Protocol for communication, typically expressed as four sets of numbers separated by periods (e.g., 192.168.123.132 for IPv4 addresses). IP addresses can identify the network a device is on and the specific device within that network. Public IP addresses used for internet-facing devices reveal geographical locations, such as country, city, or region, through IP geolocation databases.

21. Defendant voluntarily integrated "third-party resources" from the Third Parties into the Website's programming. "Third-party resources" refer to tools, content or services provided by third-parties, such as analytics tools, advertising networks, or payment processors, that a website developer utilizes by embedding scripts, styles, media, or application programming interface (API) into the website's code. Defendant's use of the third-party resources on the Website is done so pursuant to agreements between Defendant and those Third Parties.

22. The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website server to a user's web browser and stored locally on the user's device. As described below, cookies generally contain a unique identifier which enables the website to recognize and differentiate individual users. Cookie files are sent back to the website server along

with HTTP requests, enabling the website to identify the device making the requests, and to record a session showing how the user interacts with the website.

23. First-party cookies are those that are placed on the user's browser directly by the web server with which the user is knowingly communicating (in this case, the Website's servers). First-party cookies are used to track users when they repeatedly visit the same website.

24. A third-party cookie is set by a third-party domain/webserver (e.g., www.youtube.com; irxcm.com; clarity.ms, etc.). When the user's browser loads a webpage (such as a webpage of the Website) containing embedded third-party resources, the third-parties' programming scripts typically issue HTTP commands to determine whether the third-party cookies are already stored on the user's device and to cause the user's browser to store those cookies on the device if they do not yet exist. Third-party cookies include an identifier that allows the third-party to recognize and differentiate individual users across websites (including the Website) and across multiple browsing sessions.

25. As described further below, the Website has embedded the software code of multiple data brokers registered with the California Privacy Protection Agency. According to the esteemed Brennan Center for Justice, data brokers are "the main purveyors of surveillance capitalism" that "collect, assemble, and analyze personal information to create detailed profiles of individuals, which they then sell to "financial institutions and insurance firms….Advertising companies… predatory loan companies, stalkers, and scammers…foreign actors…and law enforcement and other government agencies including the FBI and the IRS."). *See* https://www.brennancenter.org/our-work/research-reports/closing-data-broker-loophole (last visited Sept. 4, 2025). Plaintiff is informed and believes and thereon alleges that the third-party cookies stored on and/or loaded from users' devices when they interact with the Website are transmitted to those third parties, enabling them to surreptitiously track in real time and

collect Website users' personal information, such as their browsing activities and private communications with Defendant, including the following:

- **Browsing History**: Information about the webpages a Website user visits, including the URLs, titles, and keywords associated with the webpages viewed, time spent on each page, and navigation patterns;
- **Visit History**: Information about the frequency and total number of visits to the Website;
- **Website Interactions**: Data on which links, buttons, or ads on the Website that a user clicks;
- **User Input Data**: The information the user entered into the Website's form fields, including search queries, the user's name, age, gender, email address, location, and/or payment information;
- **Demographic Information**: Inferences about age, gender, and location based on browsing habits and interactions with Website's content;
- **Interests and Preferences**: Insights into user interests based on the types of Website content viewed, products searched for, or topics engaged with;
- **Shopping Behavior**: Information about the Website products viewed or added to shopping carts;
- **Device Information**: Details about the Website user's device, such as the type of device (mobile, tablet, desktop), operating system, and browser type;
- **Referring URL**: Information about the Website that referred the user to the Website;
- **Session Information**: Details about the user's current Website browsing session, including the exact date and time of the user's session, the session duration and actions taken on the Websites during that session;
- **User Identifiers**: A unique ID that is used to recognize and track a specific Website user across different websites over time; and

• **Geolocation Data**: General location information based on the Website user's IP address or GPS data, if accessible.

(Collectively, the browsing activities and private communications listed in the bullet points above shall be referred to herein as "Private Communications").

26. Third-party cookies can be used for a variety of purposes, including (i) analytics (e.g., tracking and analyzing visitor behavior, user engagement, and effectiveness of marketing campaigns); (ii) personalization (e.g., remembering a user's browsing history and purchase preferences to enable product recommendations); (iii) advertising/targeting (e.g., delivering targeted advertisements based on the user's consumer profile (i.e., an aggregated profile of the user's behavior, preferences, and demographics); and (iv) social media integration (e.g., enabling sharing of users' activities with social media platforms). Ultimately, third-party cookies are utilized to boost website performance and revenue through the collection, utilization, and dissemination of user data.

27. Defendant owns and/or operates amusement parks throughout the United States and internationally including in the state of California. Defendant owns and operates the Website, which allows visitors to receive information about its amusement parks, products, and learn how to purchase tickets and passes to such amusement parks and products. As they interact with the Website (e.g., by entering data into forms, clicking on links, and making selections), Website users communicate Private Communications to Defendant, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

28. Defendant chose to install or integrate the Website with resources from the Third Parties that, among other things, use cookies. Thus, when consumers visit the Website, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendant incorporates into its

Website, or that Defendant causes to be loaded. Because Defendant controls the software code of its Website, it has complete control over whether first-party and third-party cookies are placed on its users' devices and/or transmitted to third parties.

29. Defendant explained the third-party cookies it used on the Website as follows in its Privacy Policy:

> "1.1.6 Our partners may place or recognize a cookie on your computer, device or in our emails/communications, and we may share personal information with them if you have submitted such information to us, such as your name, postal address, or email address. Our partners may link the personal information we share with them to the cookie stored on your browser or device, and they may collect information such as your IP address, browser or operating system type and version, mobile advertising IDs and demographic or inferred-interest information.
>
> …
>
> 1.2.2. For example, when you visit our Site, some information is automatically collected. Such information could include your computer's Internet Protocol ("IP") address (a number that provides an address for your computer), operating system, the site from which you linked to us ("referring page"), the name of the website you chose to visit immediately after ours (called the "exit page"), information about other websites you have recently visited, browser (software used to browse the internet) type and language, device identifier numbers, your site activity, and the time and date of your visit....
>
> 1.2.3. Our mobile applications may automatically collect certain Aggregate Information related to your use of the mobile application. Such aggregate information may include the date and time of your visit, the phone network associated with your mobile device, your mobile device's operating system or platform, the type of mobile device you use, your mobile device's unique device ID and the features of our mobile application you accessed.

1.2.4. As an integral part of providing the Services, we may use GPS, or other technology to collect geolocation data that tells us your current location….

1.2.7. Cookies are alphanumeric identifiers that we transfer to your computer's hard drive through your web browser to help us identify you when you come to our website. You have choices with respect to cookies. By modifying your browser preferences, you have the choice to accept all cookies, to be notified when a cookie is set, or to reject all cookies.

…

1.2.9. Six Flags may use analytics, including Google Analytics to analyze traffic to this web site….

1.2.10. We may also use cookies, pixels, beacons, or other web tracking technologies to track the amount of time spent on our Sites or social media and whether or not certain content, such as a video was viewed. We may work with a trusted third party to collect and process this information for us, based on our instructions and in compliance with this Privacy Policy.

1.2.11. Interest-Based Advertising:

1.2.12. We may also participate in interest-based advertising using similar technology. This means that you may see advertising on our Sites tailored to how you browse or shop, or you may see advertising for Six Flags and its properties on other websites based on your browsing behavior across websites. Some websites where we may advertise belong to ad networks that use your web browsing history to choose which ads to display on their network websites; these ads include advertising for Six Flags and its Sites…. Other websites where you see our ads, such as Facebook, may use interest preferences that you have chosen on those sites, as well as registration and other information about you, to choose which ads to display to you.

. . .

2.1. Six Flags may transfer Personal Information to third parties for the purpose of providing the Services.[1]

…

6.1. Six Flags takes the security of your Personal Information very seriously. Six Flags uses reasonable administrative, physical, and technical safeguards to secure the Personal Information you share with us."

Privacy Policy; https://www.knotts.com/legal/privacy-policy (last visited Sept. 17, 2025).

30. As mentioned above, the Website's Privacy Policy invites California residents to click a hyperlink at: https://www.knotts.com/ccpa, which sets forth Defendant's California Consumer Privacy Act Notice ("CPPA Notice"). Such CPPA Notice states that it "supplements" the Privacy Policy, and states an effective date of July 1, 2024.

31. Significantly, such CPPA Notice states in pertinent part, "We do share your personal information to process for the purpose of targeted advertising."

32. In addition, such CPPA Notice also states in relevant part:

"Information We Collect

We have collected the following categories of personal information from consumers in the last twelve (12) months:

- Identifiers (such as names, addresses, images and likenesses, IP addresses, device identifiers, and license plate numbers)
- Commercial information (such as your Six Flags purchase history)
- Internet or other electronic network activity (such as your browser type, frequency and time and date of visits to our websites, operating system, the site from which you linked to us, the name of the website you

[1] The term "Services" is broadly defined to mean "any services offered by Six Flags [Entertainment Corporation]." (Privacy Policy updated Aug. 29, 2024).

chose to visit immediately after ours, information about other websites you have recently visited, and site activity)

- Audio, visual, and similar information (such as your image and likeness)
- General geolocation data for the purposes of assisting you with parking in our parking lots or to enable you to use our interactive maps."

https://www.knotts.com/ccpa (last visited Sept. 17, 2025).

33. Such CPPA Notice address Defendant's "business purposes" for collecting such personal information in relevant part as follows:

> "Collecting and using personal information is necessary to our business of operating amusements parks and related products and services, including our websites and mobile applications. We use this information to respond to your requests, provide our products and services to you, inform you about our company and events, ***and to send you advertisements***."

https://www.knotts.com/ccpa (last visited Sept. 17, 2025) (emphasis added).

**B. Plaintiff's Investigation Has Detected Pixels, Cookies, and Spyware Operating through the Website Over Time.**

34. Plaintiff's investigation of the Website has detected cookies, pixels, and spyware operating through the Website over time.

35. Plaintiff's investigation of the Website has determined that visitor data is harvested and shared with third-party services immediately upon webpage loading, preceding any opportunity for visitors to consent to or decline the Website's non-essential cookies in the CMP and Privacy Policy.

36. The browser's developer tools allows for the inspection of third-party cookies stored on a user's device by a website, which reveals the cookie's name, the domain that set it, its category or purpose, and the platform with which it is associated.

37. Third-party cookies can only be set by the third-party server itself, and not by the website directly. Thus, if a third-party cookie is present, it necessarily means

that a tracking script from that third party was loaded and successfully executed on the website at issue.

38. Once the tracking script runs, it sends user data to the third party's server. In response, the server sets a cookie in the visitor's browser. This cookie allows the third party to recognize and track the user during future visits even across different websites.

1. **<u>TokTok</u>**

39. Plaintiff's investigation of the Website on January 11, 2025, detected TikTok code deployed on a user's browser without consent provided by the user as depicted in the screenshot below:



40. Notably, at the time of such investigation, no cookie banner or CMP existed on the Website.

41. The Website instantly sends communications to TikTok when a user views the page and track page interactions. In the example below, the right side of the image shows the various TikTok scripts being run by Defendant, and the electronic impulses being sent to TikTok to add to its collection of user behavior:



42. Plaintiff's investigation has determined that the Website discontinued use of the TikTok code at some point after January 11, 2025 and June 26, 2025.

**2. Claritas**

43. Claritas LLC ("Claritas") is a data broker registered with the California Privacy Protection Agency. *See* https://cppa.ca.gov/data_broker_registry/ (last visited Sept. 4, 2025).

44. Claritas is a company that provides data and solutions for marketers, primarily focused on identifying target audiences and optimizing marketing campaigns. Claritas offers a wide range of data assets, including demographic and behavioral information, multicultural data, and a proprietary Identity Graph.

45. Claritas's website states, "The Identity Graph leverages … methods to link IP addresses, emails (hashed emails, UID2.0), physical addresses, and mobile IDs to information on demographics, financial status, media and technology usage, buying behavior and more." https://claritas.com/claritas-identity-graph/ (last visited Sept. 18, 2025).

46. Claritas's website states on the "Claritas Privacy Notice," which states it was last updated on September 9, 2024, "**When you interact with a website, mobile app, advertising, podcast, or other online service that contains the Claritas pixel** Claritas operates a proprietary Claritas pixel. A pixel is a small transparent image that is placed on websites, mobile apps, advertisements, podcasts, and other online services that allows communication between a web browser and a server. We collect information through Claritas pixels embedded within the websites, mobile apps, advertisements, podcasts, and other online services of our business customers and third parties who have contracted with Claritas to use the pixel." https://ftp.claritas.com/privacy-legal/ (last visited Sept. 18, 2025) (emphasis in original).

47. Claritas's website sets forth a blog article from its Chief Technology Officer, Al Gadbut, stating in relevant part, "Advertisers need to know which parts of their campaigns were effective and which were not, including the people they reach.

Cookies are widely used by attribution vendors, and Claritas isn't an exception. However, this is only a small portion – approximately 10% – of deterministic and probabilistic attribution we see. Cookie-based attribution will remain a part of our measurement solutions while a stronger emphasis will be placed on our other high-quality methods of attribution that ***leverage mobile ad IDs, verified device graph households, IP address***, and emails." https://ftp.claritas.com/blog-guard-against-retirement-of-3rd-party-cookies/ (last visited Sept. 18, 2025) (emphasis added).

48. The Website sends a request to Claritas servers (arttrk.com) to track visitor activity such as the page the visitor has viewed (landing page).

49. The Claritas pixel works by collecting the visitor IP address and device user-agent string via the server, a process known as cookieless/server-side tracking as depicted in the screenshot below, which shows the sending of a pixel tracking ID in the payload request.




50. The Claritas Pixel is functional via the Website despite a visitor selecting the "Deny Non-Essential" button as depicted in the screenshot below.




### 3. <u>Basis (formerly Centro)</u>

51. Basis (formerly Centro) provides services including a programmatic advertisement platform, demand-side platform, and data activation and enrichment.

52. Basis's tracking URL is: SiteScout.com.

53. The Basis platform works by collecting first-party data from websites. The platform allows advertisers to easily use the first party data to enrich data by looking up user information stored across third-party data platforms. This is used as segmented audience data that can target users with advertisement campaigns that are managed via the Basis platform.

54. The Website tracks and identifies visitors on the Website using the Basis tracking pixel. Requests are sent to synchronize user cookie data with the server and it stores cookies on the browser that enable the Website to track and target users for the next 12 months.

/ / /

/ / /

/ / /




55. Basis's tracking cookies are functional via the Website despite a visitor selecting the "Deny Non-Essential" button. A screenshot of the request and tracking cookies is as follows:



## 4. <u>Pinterest</u>

56. Pinterest is a social media network that monetizes visitor data through displaying targeted advertisements.

57. A request is sent from the Website to Pinterest to track a pageview event. The payload data contains information useful for tracking and fingerprinting devices. This information includes: the page URL, screen dimensions, computer processor type (architecture), operating system bit depth, browser type, browser version, device type, operating system, operating system version number.

58. The Pinterest tracking pixel also stores the _pinterest_ct_ua cookie on the visitor's browser. The _pinterest_ct_ua is a third-party tracking cookie, which groups actions for users who cannot be identified by Pinterest as currently logged in. https://help.pinterest.com/en/business/article/pinterest-tag-parameters-and-cookies

59. A screenshot of the request is as follows:




60. Tracking cookies are stored on the browser and sent with the request:

/ / /

/ / /

| Name | Value | Domain | Path | Expires / Max-Age | Si |
|---|---|---|---|---|---|
| _pinterest_ct_ua | TWc9PSZ4Y09uR2hMZ0RI... | .ct.pinterest.com | / | 2026-09-12T17:12:47.450Z | |
| ar_debug | 1 | .pinterest.com | / | 2026-09-12T17:12:47.449Z | |

61. Pinterest's tracking cookies are functional via the Website despite a visitor selecting the "Deny Non-Essential" button. A screenshot of the request is as follows:




62. A screenshot of the third-party cookies is as follows:

| Name | Value | Domain | Path | Expires / Max-Age | S |
|---|---|---|---|---|---|
| _pinterest_ct_ua | TWc9PSYvUjI3WG5RbnBqY... | .ct.pinterest.com | / | 2026-09-12T17:46:59.819Z | |
| ar_debug | 1 | .pinterest.com | / | 2026-09-12T17:46:59.819Z | |

**5. <u>IPONWEB / Criteo</u>**

63. IPONWEB is a programmatic advertising platform that enables real-time bidding for advertisers to have their ads displayed to users.

64. Requests are sent to IPONWEB / Criteo servers that include bidder identification values and stores tracking cookies on the browser that are used to track and target users for advertising and marketing purposes.

65. The _li_ss cookie is stored for 29 days. The lidid cookie is stored for two years.

66. The existence of the two tracking cookies is depicted in the screenshot image below:




## C. Defendant Falsely Informed Users that They Could Reject the Website's Use of Cookies.

67. When consumers in California visited the Website, the Website immediately displayed to them a pop-up cookie consent banner. The pop-up cookie consent banner stated, "This website utilizes technologies such as cookies to enable essential site functionality, as well as for analytics, personalization, and targeted advertising."

68. The cookie consent banner purported to provide users the opportunity to "Deny Non-Essential" cookies as shown in the following screenshot from the Website:

/ / /

/ / /

/ / /




69. Website users who clicked or selected the "Deny Non-Essential" cookies button, indicating their choice and/or agreement to decline or reject all cookies and tracking technologies in use on the Website, could then continue to browse the Website, and the pop-up cookie consent banner disappeared.

70. Defendant's pop-up cookie consent banner led Plaintiff, and all those similarly situated users of the Website, to believe that they declined or rejected all cookies and tracking technologies, especially those that share personal information with third parties, such as performance, targeting, and social media cookies. The banner further reasonably led Plaintiff and other Website users to believe that Defendant would not allow third parties, through cookies, to access their Private Communications with the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon clicking or selecting the "Deny Non-Essential" cookies button. Defendant's representations, however, were false.

71. In truth, Defendant did not abide by its users' wishes. Even though Defendant received notice that certain users, through their selection of the "Deny Non-

Essential" cookies button did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Website, Defendant nonetheless caused the Third Party tracking cookies to be placed on Website users' browsers and devices and/or transmitted to the Third Parties along with user data—***even for those users who elected to reject all non-essential cookies***.

72. In particular, when users clicked or selected the "Deny Non-Essential" cookies button, Defendant nonetheless continued to cause the Third Parties' cookies to be placed on users' devices and/or transmitted to the Third Parties along with user data, enabling them to collect user data in real time that discloses Website visitors' Private Communications, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even when consumers like Plaintiff tried to protect their privacy by rejecting cookies, Defendant failed to prevent cookies from being transmitted to Third Parties, enabling them to track user behavior and communications.

73. Some aspects of the operations of the Third Party cookies on the Website can be observed using specialized tools that log incoming and outgoing Website network transmissions.

74. After selecting the option to reject all "non-essential cookies," a request is sent to Osano.com to track the user's preference.




75. The following screenshot, obtained using one such tool, shows an example of Third-Party cookies being transmitted from a Website user's device and browser to the servers of third parties even after the user clicked the "Deny Non-Essential" cookies

button on the Website's pop-up cookie consent banner. Such screenshot depicts the third-party cookies stored on the visitor's browser after the page is refreshed, which includes advertising cookies for IPONWEB/Criteo, Pinterest, and Basis/Centro/SiteScout.




76. The following screenshots depict all requests sent after refreshing the page and opting out of non-essential cookies:

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /


Knott's
Park: 10 AM - 8 PM Scary Farm: Closed View Hours
Choose Another Park
Learn about our chaperone policy
Learn More
MVP SALE
MOST VALUABLE PASS
LAST CHANCE! Buy a 2026 Gold Pass for 10 Payments of $9* & get access to 40+ parks thru 2026.
Buy Now
02 Days 13 Hours 09 Minutes 01 Seconds
2026 GOLD PASS
LOWEST PRICE OF THE YEAR ENDS SEPTEMBER 14!
BONUS Free Bring-A-Friend Ticket & No Blockout Dates
Buy Now
Special Events
View All Upcoming Events
September 18 Knott's Scary Farm 7:00PM - 1:00AM View Details
GET YOUR SEASON PASS
Elements Network Console Sources Application Privacy and security Performance Memory Lighthouse
Preserve log Disable cache Offline
Filter Invert More filters All Fetch/XHR Doc CSS JS Font Img Media
Name Path Domain Cookies Set Cookies
osano.js
styles.css
emergency-alert-bar-component.css
ticket-widget.css
social-media.css
partner-bar.css
cta-component.css
cta-group.css
banner.css
upcoming-events.css
countdown-clock.css
promo-bar.css
quantum-sisflags.js
author-profile.jpg
justine-young-headshot-square.png
main.js
emergency-alert-bar-component.js
newsletter-signup.js
api.js
ticket-widget.js
social-media.js
partner-bar.js
cta-component.js
cta-group.js
banner.js
countdown-clock.js
promo-bar.js
accesso.js
gtm.js?id=GTM-WKCGZ8X
OpenSans-Regular.woff2
map_marker_outlined.svg
cdr-historic-blog-title.png
sadeyejail.jpg
OpenSans-Bold.woff2
Tungsten-Semibold_Web.woff2
kbf-scary-farm-cta-25.jpg
kbf-scaryfarm-ticketcategory.jpg
cmp.osano.com
cdn-cloudfront.cfauthx.com
cdn.quantummetric.com
try.abtasty.com
www.google.com
cf-kbf.store.cfunkb.com
www.googletagmanager.com

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /




77. As mentioned above, the Claritas Pixel is functional via the Website despite a visitor selecting the “Deny Non-Essential” button.

78. Website users’ Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, are surreptitiously obtained by the Third Parties via these cookies (or in the case of Claritas, via the Claritas pixel).

79. As users interact with the Website, even after clicking or selecting the “Deny Non-Essential” cookies button, thereby declining or rejecting the use of cookies

and similar technologies that share personal information with third parties, such as performance, targeting, and social media cookies, more data regarding users' behavior and communications are sent to third parties, alongside the cookie data. The third-party cookies that Defendant wrongfully allows to be stored on users' devices and browsers, and to be transmitted to the Third Parties, enable the Third Parties to track and collect data on users' behaviors and communications, including Private Communications, on the Website. Because third-party cookies enable Third Parties to track users' behavior across the Internet and across time, user data can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics (including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These Third Parties monetize user profiles for advertising, sales, and marketing purposes to generate revenue and target advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

80. The Third Party code that the Website causes to be loaded and executed by the user's browser becomes a wiretap when it is executed because it enables the Third Parties—separate and distinct entities from the parties to the conversations—to use cookies to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties. When the Third Parties use their respective wiretaps on Website users' Private Communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes as described in more detail below.

## D. <u>The Private Communications Collected Are Valuable.</u>

81. The Private Communications that the Third Parties (and other third parties) track and collect by way of the cookies on the Website is valuable to Defendant as well as the Third Parties (and other third parties). Defendant can use the data to create and

analyze the performance of marketing campaigns, website design, product placement, and target specific users or groups of users for advertisements. For instance, if Defendant wanted to market certain of its products to consumers, Defendant could use the data collected by the Third Parties to monitor users who visit webpages related to specific products, then advertise similar products to those particular users when they visit other webpages. The third-party cookies also enable Defendant to target online advertisements to users when they visit ***other*** websites, even those completely unrelated to Defendant and its products and services.

82. Data about users' browsing history enables Defendant to spot patterns in users' behavior on the Website and their interests in, among other things, Defendant's products. On a broader scale, it enables Defendant to gain an understanding of trends happening across its brands and across the consumer electronics market. All of this helps Defendant further monetize its Website and maximize revenue by collecting and analyzing user data.

83. The value of the Private Communications tracked and collected by the Third Parties using cookies on the Website can be quantified. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium."[2] Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id.* "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id.*

84. Numerous empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured as either the consumer's willingness to accept compensation to sell her data or the consumer's willingness to pay to protect her information.

---

[2] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004).

85. Through its false representations and aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties to track users' Private Communications on the Website using third-party cookies, Defendant is unjustly enriching itself at the cost of consumer privacy and choice, when the consumer could otherwise have the ability to choose if and how they would monetize their data.

### E. <u>Plaintiff's Experiences</u>

86. In May 2024, Plaintiff visited the Website to browse information about the amusement park services and products advertised on the Website. Plaintiff was unaware of the secret spyware being used to surveil visitors and to monetize their personal information. Plaintiff is both (1) genuinely interested in the goods, services, and information available on Defendant's Website, and (2) a consumer privacy advocate who works as a "tester" to ensure that companies abide by the privacy obligations imposed by California law. The Ninth Circuit recently made exceptionally clear that it is "necessary and desirable for committed individuals to bring serial litigation" to enforce and advance consumer protection statutes, and that Courts must not make any impermissible credibility or standing inferences against them. *Langer v. Kiser*, 57 F.4th 1085, 1095 (9th Cir. 2023).

87. At the time of Plaintiff's May 2024 visit to the Website, the Website failed to present any type of a pop-up cookie consent banner notifying Plaintiff about either Defendant's Privacy Policy applicable to its Website or requesting Plaintiff's assent to the Website's use of any cookies to collect Plaintiff's information about Plaintiff's device or about Plaintiff's interactions with the Website.

88. In other words, the Website failed to provide a "Notice at Collection" of personal information in compliance with the CCPA, (Cal. Civ. Code § 1798.100(a)(1)-(3)), and California's regulation at 11 C.C.R. § 7012 at that time, which are part of the California Consumer Privacy Act Regulations. 11 C.C.R. § 7000(a). Such Regulations define "Notice at Collection" to mean "the notice given by a business to a consumer at or before the point at which a business collects personal information from the consumer

as required by Civil Code section 1798.100, subdivisions (a) and (b), and specified in these regulations." 11 C.C.R. § 7001(q).

89. Section 7012 provides, "The Notice at Collection shall be made readily available where consumers will encounter it at or before the point of collection of any personal information." 11 C.C.R. § 7012(c). Such regulation provides an "[i]llustrative example" as follows: "When a business collects consumers' personal information online, it may post a conspicuous link to the notice on the introductory page of the business's website and on all webpages where personal information is collected." 11 C.C.R. § 7012(c)(1). Section 7012 provides, "If a business does not give the Notice at Collection to the consumer at or before the point of collection of their personal information, the business shall not collect personal information from the consumer." 11 C.C.R. § 7012(d).

90. Because of the absence of a "Notice at Collection" on the homepage of the Website during her May 2024 visit, as a California resident, Plaintiff reasonably relied upon the absence of such "Notice at Collection" to indicate that the Website was not collecting, using, or sharing Plaintiff's personal information with any third parties during such visit.

91. During Plaintiff's May 2024 visit, third party cookies began to collect information about Plaintiff's device and Plaintiff's interactions with the Website the moment that Plaintiff landed on the Website.

92. In addition, in September 2025, Plaintiff visited the Website once again to browse information about the amusement park services and products advertised on the Website.

93. When Plaintiff visited the Website in September 2025, the Website immediately presented her with Defendant's pop-up cookie consent banner, which provided the option to select the "Deny Non-Essential" cookies button. Plaintiff viewed Defendant's representation on the pop-up cookie consent banner that, "This website utilizes technologies such as cookies to enable essential site functionality, as well as for

analytics, personalization, and targeted advertising." Plaintiff also viewed Defendant's additional representation that users could "Deny Non-Essential" cookies.

94. Consistent with her typical practice in rejecting or otherwise declining the placement or use of cookies and tracking technologies, Plaintiff selected and clicked the "Deny Non-Essential" cookies button. Plaintiff believed that selecting the "Deny Non-Essential" cookies button on the pop-up cookie consent banner found on the Website would allow her to opt out of, decline, and/or reject all cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of user data to third-party advertising networks, analytics services, and/or social media companies for the purposes of providing personalized content, advertising, and analytics services).

95. In selecting the "Deny Non-Essential" cookies button Plaintiff gave Defendant notice that she did not consent to the use or placement of cookies and tracking technologies while browsing the Website. In reliance on these representations and promises, only when did Plaintiff continue browsing the Website.

96. Even before the pop-up cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for performance targeting, and social media functions, to be placed on Plaintiff's device and/or transmitted to the Third Parties along with user data, without Plaintiff's knowledge. Accordingly, the pop-up cookie consent banner's representation to Plaintiff that she could reject the use and/or placement of all non-essential cookies and tracking technologies while she browsed the Website was false. Contrary to what Defendant made Plaintiff believe, she did not have a choice about whether third-party cookies would be placed on her device and/or transmitted to the Third Parties along with her user data; rather, Defendant had already caused that to happen.

97. Then, as Plaintiff continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner, and despite Plaintiff's clear rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies

along with user data, including those involved in providing performance, targeting, and social media services, from the Third Parties on her device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff's Private Communications as Plaintiff browsed the Website.

98. Defendant's representations that consumers could "Deny Non-Essential" cookies while Plaintiff and users browsed the Website were untrue. Had Plaintiff known this fact, she would not have used the Websites. Moreover, Plaintiff reviewed the pop-up cookie consent banner prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to reject all non-essential cookies, Plaintiff would have noticed it and would not have used the Website or, at a minimum, she would have interacted with the Website differently.

99. Plaintiff continues to desire to browse content featured on the Website. Plaintiff would like to browse websites that do not misrepresent that users can reject all cookies and tracking technologies. If the Website was programmed to honor users' requests to reject cookies and tracking technologies, Plaintiff would likely browse the Website again in the future, but will not do so until then. Plaintiff regularly visits websites that feature content similar to that of the Website. Because Plaintiff does not know how the Website is programmed, which can change over time, and because she does not have the technical knowledge necessary to test whether the Website honors users' requests to reject all non-essential cookies and tracking technologies, Plaintiff will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the

HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff is not a software developer and has not received training with respect to HTTP network calls.

100. Thus, legal damages are inadequate to remedy the imminent threat of future harm that Plaintiff faces. Only an injunction can remedy this threat of future harm.

## V. CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Federal Wiretap Act

### (Violation of 18 U.S.C. § 2511)

101. Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

102. The federal Wiretap Act creates criminal liability for "any person who … intentionally intercepts … any wire, oral, or electronic communication," or who "intentionally uses" such content "knowing or having reason to know that the information was obtained through" interception. 18 U.S.C. § 2511(1)(a) & (d).

103. The third-party cookies or tracking pixels installed on the Website were used to intercept the contents of communications between Plaintiff and the Website in real time, including HTTP requests, URLs visited, and other metadata exchanged as part of Plaintiff's interactions with the Website. These communications constitute "electronic communications" under 18 U.S.C. § 2510(12).

104. Defendant and/or its agents intentionally intercepted, or procured the interception of, these electronic communications using the cookies or tracking pixel technology, without Plaintiff's knowledge or consent.

105. The interception occurred contemporaneously with the transmission of the electronic communication, satisfying the "in transit" requirement under the Wiretap Act.

106. No exception under 18 U.S.C. § 2511(2)(d) applies because Plaintiff did not consent to the interception, and Defendant exceeded any purported authorization by

misrepresenting the nature of the data collection and the identity of the third-party recipients.

107. Defendant acted with a tortious and unlawful purpose when it enabled and permitted a third-party data broker to intercept Plaintiff's electronic communications through the use of a tracking pixel embedded on Defendant website. Under 18 U.S.C. § 2511(2)(d), even if one party to a communication consents, the Wiretap Act is violated if the interception is made for the purpose of committing any criminal or tortious act. Courts have recognized that surreptitious data collection in violation of privacy rights can satisfy this "tortious purpose" standard. In *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589, 607 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1684 (2021), the Ninth Circuit held that Facebook's interception of browsing activity via tracking technologies could constitute a violation of the Wiretap Act where the conduct was undertaken for the purpose of violating users' privacy rights, such as by committing the tort of intrusion upon seclusion. Here, Defendants' facilitation of a third-party's interception—despite promising to protect user privacy—was done with the purpose of enabling commercial exploitation of user data in violation of California common law privacy rights, including intrusion upon seclusion. This renders the interception unlawful under § 2511(2)(d).

108. Defendant intended to disclose its Website visitors' personally identifiable communications to Third Parties (and other third parties) so that it could deliver targeted advertisements to its customers despite its promise not to collect or use Private Communications for users who selected the "Deny Non-Essential" cookies button in the cookie consent banner.

109. Defendant customized and deployed the third party code embedded on its Website, which allowed the transmission and storage of third party cookies onto Plaintiff's device and browser, and, as a result, played an active role in the use of the code to intercept Plaintiff's electronic communications and knowingly and unlawfully used those intercepted communications to guide its advertising and marketing efforts.

110. As a result of this unlawful interception, Plaintiff is entitled to damages under 18 U.S.C. § 2520(c)(2)(A)-(B), including the greater of actual damages and any profits made by the violator as a result of the violation or statutory damages of the greater of $100 per day per violation or $10,000, punitive damages under 18 U.S.C. § 2520(b)(2), reasonable attorney's fees under 18 U.S.C. § 2520(b)(3), and equitable relief and declaratory relief under 18 U.S.C. § 2520(b)(1).

## SECOND CLAIM FOR RELIEF

### Invasion of Privacy

111. Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

112. To plead an invasion of privacy claim, Plaintiff must show an invasion of (i) a legally protected privacy interest; (ii) where Plaintiff had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Defendant constituting a serious invasion of privacy.

113. Defendant has intruded upon the following legally protected privacy interests of Plaintiff: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, Article I, § 1, which guarantees Californians the right to privacy; (iii) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (iv) Plaintiff's Fourth Amendment right to privacy.

114. Plaintiff had a reasonable expectation of privacy under the circumstances, as Defendant affirmatively promised users they could "Deny Non-Essential" cookies and tracking technologies before proceeding to browse the Websites. Plaintiff directed her electronic device to access the Website and, when presented with the pop-up cookies consent banner on the Website, Plaintiff rejected all non-essential cookies and reasonably expected that her rejection of all non-essential cookies and tracking technologies would be honored. That is, Plaintiff reasonably believed that Defendant would not permit the Third Parties to store and send cookies and/or use other such

tracking technologies on her devices while Plaintiff browsed the Website. Plaintiff also reasonably expected that, if Plaintiff rejected all cookies and/or tracking technologies, Defendant would not permit the Third Parties to track and collect Plaintiff's Private Communications, including her browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, on the Website.

115. Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website application, or advertisement." Cal. Civ. Code § 1798.140(u)(1)(F).

116. Plaintiff also had a reasonable expectation of privacy under the circumstances in regards to her October 2024 visit to the Website, as Defendant omitted material facts that it was duty-bound by California law to provide via a mandatory "Notice at Collection."

117. "A duty to disclose a material fact can arise if … it is imposed by statute…." *Zeichner v. Nord Security Inc.*, 2024 WL 4951261, at *6 (N.D. Cal. Dec. 2, 2024) (quoting *Rattagan v. Uber Techs., Inc.*, 17 Cal. 5th 1, 40 (2024)). Here, the CCPA and its regulations imposed upon Defendant a statutory duty to disclose material facts about its collection of personal information from California consumers who used the Website to avoid misleading such consumers about the nature of its personal information collection practices on the Website in May 2024.

118. Defendant violated the foregoing requirements by failing to provide a Notice at Collection in accordance with the CCPA. Such violations of the CCPA constitute material omissions by Defendant arising from a statutorily-prescribed duty.

119. Defendant, in violation of Plaintiff's reasonable expectation of privacy, and without Plaintiff's consent, permits the Third Parties and other third parties to use

cookies and other tracking technologies to collect, track, and compile users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. The data that Defendant allowed third parties to collect enables the Third Parties to, inter alia, create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; create audience segments based on shared traits (such as millennials, tech enthusiasts, etc.); and perform targeted advertising and marketing analytics. Further, the Third Parties (and other third parties) share user data and/or the user profiles to unknown parties to further their financial gain. The consumer profiles are and can be used to further invade Plaintiff's and users' privacy, by allowing third parties to learn intimate details of their lives, and target them for advertising and other purposes, as described herein, thereby harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them.

120. Defendant's actions constituted a serious invasion of privacy in that it invaded a zone of privacy protected by the Fourth Amendment (i.e., one's personal communications), and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

121. Defendant's intrusion into Plaintiff's privacy was also highly offensive to a reasonable person.

122. Defendant lacked a legitimate business interest in causing the placement and/or transmission of third-party cookies along with user data that allowed the Third Parties to track, intercept, receive, and collect Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, without their consent.

123. Plaintiff has been damaged by Defendant's invasion of her privacy and is entitled to just compensation, including monetary damages.

124. Plaintiff seeks appropriate relief for that injury, including but not limited to, damages that will compensate her for the harm to her privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiff's privacy.

125. Plaintiff seeks punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiff and made in conscious disregard of Plaintiff's rights and Plaintiff's rejection of the Website's use of all cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

## THIRD CLAIM FOR RELIEF

### Intrusion Upon Seclusion

126. Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

127. To assert a claim for intrusion upon seclusion, Plaintiff must plead (i) that Defendant intentionally intruded into a place, conversation, or matter as to which Plaintiff had a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

128. By permitting third-party cookies to be stored on consumers' devices, which enabled the Third Parties (and other third parties) to track and collect Plaintiff's Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, in violation of Defendant's representations otherwise in the Website's pop-up cookie consent banner, Defendant intentionally intruded upon the solitude or seclusion of Website users. Defendant effectively placed

the Third Parties in the middle of communications to which they were not invited, welcomed, or authorized.

129. The Third Parties' (and other third parties') tracking and collecting of Plaintiff's Private Communications on the Website using third-party cookies that Defendant caused to be stored on users' devices—and to be transmitted to Third Parties (and other third parties)—was not authorized by Plaintiff, and, in fact, Plaintiff specifically chose to "Deny Non-Essential" cookies.

130. Plaintiff had an objectively reasonable expectation of privacy surrounding her Private Communications on the Website based on Defendant's promise that users could "Deny Non-Essential" cookies, as well as state criminal and civil laws designed to protect individual privacy.

131. Defendant's intentional intrusion into Plaintiff's and other Website users' Private Communications would be highly offensive to a reasonable person given that Defendant represented that Website users could "Deny Non-Essential" cookies when, in fact, Defendant caused such third-party cookies to be stored on consumers' devices and browsers, and to be transmitted to third parties, even when consumers rejected all such cookies. Indeed, Plaintiff reasonably expected, based on Defendant's false representations, that when she rejected all cookies and tracking technologies, Defendant would not cause such third-party cookies to be stored on her device or permit the Third Parties to obtain her Private Communications on the Website, including her browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

132. Defendant's conduct was intentional and intruded on Plaintiff's Private Communications on the Website.

133. Plaintiff has been damaged by Defendant's invasion of her privacy and is entitled to just compensation, including monetary damages. *See Rodriguez v. Google LLC*, No. 3:20-cv-04688-RS, Doc. 670 (N.D. Cal. Sept. 4, 2025) (awarding

$425,651,947 in actual damages in class action following jury verdict finding liability for invasion of privacy and intrusion upon seclusion claims).

134. Plaintiff seeks appropriate relief for that injury, including but not limited to, damages that will compensate her for the harm to her privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiff's privacy.

135. Plaintiff seeks punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiff and made in conscious disregard of Plaintiff's rights and Plaintiff's rejection of the Website's use of cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**<u>FOURTH CLAIM FOR RELIEF</u>**

**California Invasion of Privacy Act**

**(Violation of Cal. Penal Code § 631(a))**

136. Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

137. California Penal Code § 631(a) provides, in pertinent part:

> "Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

138. The California Supreme Court has repeatedly stated an "express objective" of the California Invasion of Privacy Act ("CIPA"), codified at Cal. Penal Code § 630 *et seq*., is to "protect a person placing or receiving a call from a situation where the person on the other end of the line permits an outsider to tap his telephone or listen in on the call." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985).

139. Further, as the California Supreme Court has held, in explaining the legislative purpose behind CIPA:

> "While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and *its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device*.
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication— the right to control the nature and extent of the firsthand dissemination of his statements."

*Ribas*, 38 Cal. 3d at 360-61 (emphasis added; internal citations omitted).

140. Section 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Court*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under § 631(a), Plaintiff need only establish that Defendant, "by means of any machine, instrument, contrivance, or in any other manner," did ***any*** of the following:

> "[i] Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system;
>
> [ii] Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or

> meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state;
>
> [iii] Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained"

Cal. Penal Code § 631(a).

141. Section 631(a) also penalizes those who [iv] "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

142. Defendant is a "person" within the meaning of California Penal Code § 631.

143. Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Bradley v. Google, Inc.*, 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

144. The Third Parties' (and other third parties') cookies—as well as the software code of the Third Parties (and other third parties) responsible for placing the cookies and transmitting data from user devices to the Third Parties (and other third parties)—constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and, even if they do not, Defendant's deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner").

145. Each of the Third Parties is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F.

Supp. 3d 503, 520 (C.D. Cal. 2021). Further, the Third Parties had the capability to use the wiretapped information for their own purposes and, as alleged above, they did in fact use the wiretapped information for their own business purposes.

146. Under § 631(a), Defendant must show it had the consent of all parties to a communication.

147. At all relevant times, the Website caused Plaintiff's browser to store the Third Parties' (and other third parties') cookies and to transmit those cookies alongside Private Communications—including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—to the Third Parties (and other third parties) without Plaintiff's consent. By configuring the Website in this manner, Defendant willfully aided, agreed with, employed, permitted, or otherwise enabled the Third Parties (and other third parties) to wiretap Plaintiff using the Third Parties' (and other third parties') cookies and to accomplish the wrongful conduct alleged herein.

148. At all relevant times, by their cookies and corresponding software code, the Third Parties (and other third parties) willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiff, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

149. The Private Communications of Plaintiff, on the one hand, and Defendant, on the other, that the Third Parties (and other third parties) automatically intercepted directly communicates the Website user's affirmative decisions, actions, choices, preferences, and activities, which constitute the "contents" of electronic communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping

behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

150. At all relevant times, the Third Parties (and other third parties) used or attempted to use the Private Communications automatically intercepted by their cookie tracking technologies for their own purposes.

151. Plaintiff did not provide her prior consent to the Third Parties' (and other third parties') intentional access, interception, reading, learning, recording, collection, and usage of Plaintiff's electronic communications. Nor did Plaintiff provide her prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' (or other third parties') conduct. On the contrary, Plaintiff expressly declined to allow Third Parties' (or other third parties') cookies and tracking technologies to access, intercept, read, learn, record, collect, and use Plaintiff's electronic communications by choosing "Deny Non-Essential" cookies in the Website's cookie consent banner.

152. The wiretapping of Plaintiff occurred in California, where Plaintiff accessed the Website and where the Third Parties (and other third parties)—as enabled by Defendant—routed Plaintiff's electronic communications to Third Parties' servers. Among other things, the cookies, as well as the software code responsible for placing the cookies and transmitting them and other Private Communications to the Third Parties (and other third parties), resided on Plaintiff's California-located device. In particular, the user's California-based device, after downloading the software code from the Third Parties' (and other third parties') servers, (i) stored the code onto the user's disk; (ii) converted the code into machine-executable format; and (iii) executed the code, causing the transmission of data (including cookie data) to and from the Third Parties (and other third parties).

153. Plaintiff has suffered loss by reason of these violations, including, but not limited to, (i) violation of his and their right to privacy; (ii) loss of value in [his] and their Private Communications; (iii) damage to and loss of Plaintiff's property right to

control the dissemination and use of their Private Communications; and (iv) loss of their Private Communications to the Third Parties (and other third parties) with no consent.

154. Pursuant to California Penal Code § 637.2, Plaintiff has been injured by the violations of California Penal Code § 631, and seeks statutory damages of the greater of $5,000, or three times the amount of actual damages, for each of Defendant's violations of CIPA § 631(a), as well as injunctive relief.

155. Unless enjoined, Defendant will continue to commit the illegal acts alleged herein including, but not limited to, permitting third parties to access, intercept, read, learn, record, collect, and use Plaintiff's electronic Private Communications with Defendant. Plaintiff, and the general public continue to be at risk because Plaintiff, and the general public frequently use the internet to search for information and content related to amusement park services and products. Plaintiff and the general public continue to desire to use the internet for that purpose. Plaintiff and the general public have no practical way to know if her request to reject all non-essential cookies and tracking technologies will be honored and/or whether Defendant will permit third parties to access, intercept, read, learn, record, collect, and use Plaintiff's electronic Private Communications with Defendant. Further, Defendant has already permitted the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiff's electronic Private Communications with Defendant and will continue to do so unless and until enjoined.

## FIFTH CLAIM FOR RELIEF

### California Invasion of Privacy Act

### (Violation of Cal. Penal Code § 638.51)

156. Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

157. CIPA includes the following statement of purpose:

"The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of

> eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."

(Cal. Penal Code § 630.)

158. CIPA extends civil liability for various means of surveillance using technology, including the installation of a trap and trace device. Sections 638.50 and 638.51 of the California Penal Code are part of the CIPA.

159. California Penal Code § 638.51(a) provides that "a person may not install or use…a trap and trace device without first obtaining a court order.…"

160. A "trap and trace device" is "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

161. The Third Parties' (or other third parties') cookies and the corresponding software code installed by Defendant on its Website is each a "trap and trace device" because each "captures" "routing, addressing, or signaling information"—including, the IP address and user-agent information—from the electronic communications transmitted by Plaintiff's computer or device. (Cal. Penal Code § 638.50(c).)

162. At all relevant times, Defendant caused the Third Parties' (and other third parties') cookies and the corresponding software code—which are trap and trace devices—to be placed on browsers and devices, and/or to be used to transmit Plaintiff's IP address and user-agent information. *See Greenley v. Kochava*, 684 F. Supp. 3d 1024, 1050-51 (S.D. Cal. 2023); *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 928-33 (N.D. Cal. 2024).

163. Some of the information collected by the Third Parties' (and other third parties') cookies and the corresponding software, including IP addresses and user-agent

information, does not constitute the content of Plaintiff's electronic communications with the Website. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1008 (9th Cir. 2014) ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up).

164. Plaintiff did not provide her prior consent to Defendant's use of third-party cookies and the corresponding software. On the contrary, Plaintiff informed Defendant that she did not consent to the Website's use of third-party cookies by clicking the "Deny Non-Essential" cookies button in the cookie consent banner.

165. Defendant did not obtain a court order to install or use the third-party cookies and corresponding software to track and collect Plaintiff's IP address and user-agent information.

166. As a direct and proximate result of Defendant's conduct, Plaintiff suffered losses and was damaged in an amount to be determined at trial.

167. Pursuant to Penal Code § 637.2(a)(1), Plaintiff is also entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51(a).

## SIXTH CLAIM FOR RELIEF

### Common Law Fraud

168. Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

169. Defendant fraudulent and deceptively informed Plaintiff that she could "Deny Non-Essential" cookies.

170. However, despite Defendant's representations otherwise, Defendant caused third party cookies and software code to be stored on consumers' devices, and to be transmitted to the Third Parties alongside Private Communications, even after users clicked the "Deny Non-Essential" cookies button in the Website's pop-up cookie consent banner. These cookies and corresponding software code allowed the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiff's Private

Communications, even when consumers had previously chosen to "Deny Non-Essential" cookies.

171. These misrepresentations and omissions were known exclusively to, and actively concealed by Defendant, not reasonably known to Plaintiff, and material at the time they were made. Defendant knew, or should have known, how the Website functioned, including the Third Party's resources it installed on the Website and the third-party cookies in use on the Website, through testing the Website, evaluating their performance metrics by means of its accounts with the Third Parties, or otherwise, and knew, or should have known, that the Website's programming allowed the third-party cookies to be placed on users'—including Plaintiff's—browsers and devices and/or transmitted to the Third Parties along with users' Private Communications even after users attempted to "Deny Non-Essential" cookies, which Defendant promised its users they could do. Defendant's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to use the Website. In misleading Plaintiff and not so informing her, Defendant breached its duty to Plaintiff. Defendant also gained financially from, and as a result of, its breach.

172. Plaintiff relied to her detriment on Defendant's misrepresentations and fraudulent omissions.

173. Plaintiff has suffered an injury-in-fact, including the loss of money and/or property, as a result of Defendant's unfair, deceptive, and/or unlawful practices, including the unauthorized interception of her Private Communications, including her browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, which have value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Plaintiff has also suffered harm in the form of diminution of the value of her private and personally identifiable information and communications.

174. Defendant's actions caused damage to and loss of Plaintiff's property right to control the dissemination and use of their personal information and communications.

175. Defendant's representation that consumers could reject all cookies if they clicked the "Deny Non-Essential" cookies button was untrue. Again, had Plaintiff known these facts, she would not have used the Website. Moreover, Plaintiff reviewed the Website's pop-up cookie consent banner prior to her interactions with the Website. Had Defendant disclosed that it caused third-party cookies to be stored on Website visitors' devices that share personal information with third parties, such as performance, targeting, and social media cookies, even after they choose to "Deny Non-Essential" cookies, Plaintiff would have noticed it and would not have interacted with the Website.

176. By and through such fraud, deceit, misrepresentations and/or omissions, Defendant intended to induce Plaintiff to alter her position to her detriment. Specifically, Defendant fraudulently and deceptively induced Plaintiff to, without limitation, use the Website under the mistaken belief that Defendant would not permit third parties to obtain users' Private Communications when consumers chose to reject all cookies. As a result, Plaintiff provided more personal data than she would have otherwise.

177. Plaintiff justifiably and reasonably relied on Defendant's misrepresentations and omissions, and, accordingly, was damaged by Defendant's conduct.

178. As a direct and proximate result of Defendant's misrepresentations and/or omissions, Plaintiff has suffered damages, as alleged above, and is entitled to just compensation, including monetary damages.

179. Plaintiff seeks punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiff made in conscious disregard of Plaintiff's rights and Plaintiff's rejection of the Website's use of cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

## SEVENTH CLAIM FOR RELIEF

### Unjust Enrichment

180. Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

181. Defendant created and implemented a scheme to increase its own profits through a pervasive pattern of false statements and fraudulent omissions.

182. Defendant was unjustly enriched as a result of its wrongful conduct, including through its misrepresentation that users could "Deny Non-Essential" cookies and by permitting the Third Parties to store and transmit cookies on Plaintiff's device and browser, which permitted the Third Parties to track and collect Plaintiff's Private Communications, including her browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, even after Plaintiff rejected such cookies.

183. Plaintiff's Private Communications have conferred an economic benefit on Defendant.

184. Defendant has been unjustly enriched at the expense of Plaintiff, and Defendant has unjustly retained the benefits of its unlawful and wrongful conduct.

185. Defendant appreciated, recognized, and chose to accept the monetary benefits that Plaintiff conferred onto Defendant at her detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of Plaintiff.

186. It would be unjust for Defendant to retain the value of Plaintiff's property and any profits earned thereon.

187. There is no justification for Defendant's enrichment. It would be inequitable, unconscionable, and unjust for Defendant to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct.

188. Plaintiff is entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiff to the position she occupied prior to having her Private Communications tracked and collected by the Third Parties.

189. Plaintiff pleads this claim separately, as well as in the alternative, to her other claims, as without such claims Plaintiff would have no adequate legal remedy.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks judgment against Defendant as follows:

a. An award of compensatory damages, including statutory damages where available, to Plaintiff against Defendant for all damages sustained as a result of Defendant's wrongdoing including both pre- and post-judgment interest thereon;
b. An award of punitive damages;
c. An award of nominal damages;
d. An order for full restitution;
e. An order requiring Defendant to disgorge revenues and profits wrongfully obtained;
f. An order permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;
g. An order for declaratory relief;
h. For reasonable attorneys' fees and costs as allowed by law; and
i. For such further relief as may be just and proper.

Dated: September 19, 2025 PACIFIC TRIAL ATTORNEYS, APC

By: *_/s/ Scott J. Ferrell_*
Scott J. Ferrell
Attorneys for Plaintiff